IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| SOUTHSHORE RESTORE LLC; HEARTLAND GREENS LLC; BLOUNTS & MOORE LLC; LAKESHORE GREENS LLC; THE DOOBIE ROOM LLC; BOTAVI WELLNESS LLC; DEEP EARTH LLC; THE HEALING SOURCE LLC; EMERALD COAST LLC; BIAMED LLC; NORTHLAND DISPENSARY LLC; CANNABISTRO LLC; PGW LLC; EMERALD ISLAND LLC; PRAIRIE GRASS LLC; JG IL LLC; RENU LLC; TC APPLICO LLC; THIRD COAST GREENHOUSE; KAP JG LLC; and CELESTIA LLC; | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Judge Alonso |
| v. | ) ) ) | Case No. 20 C 5264 |
| ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION; BRETT BENDER, DEPUTY DIRECTOR; and AS-YET UNKNOWN DEFENDANTS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND**
<u>**PRELIMINARY INJUNCTIVE RELIEF**</u>

Jon Loevy
Michael Kanovitz
Loevy and Loevy (41295)
311 North Aberdeen Street
Chicago, IL 60607
(312) 243-5900

## Introduction

By statute, the Illinois Department of Financial and Professional Regulation ("Department") is responsible for distributing 75 extremely valuable licenses to operate cannabis dispensaries. These licenses are collectively worth more than a billion dollars. More than 700 companies applied for them, spending millions of dollars and many months on their applications. The majority of these 700+ aspirants (including Plaintiffs) were social equity applicants who had been firmly promised a fair opportunity to participate in the newly-legal cannabis industry.

Late last week, shortly before the Labor Day holiday, the Department announced its intention to give away all 75 of the Licenses by lot (hereafter, the "Lottery"), as soon as the end of this week, to a group of only 21 companies. Most of these chosen 21 companies are owned by politically-connected insiders, including a not insignificant number with disturbing connections to the State's cannabis Program and the contractor hired to evaluate the applicants. Less than 3% of all applicants will thus each receive three or more of the 75 available Licenses via this Lottery.

The State has expressly denied any opportunity for administrative review for the 700+ applicants deemed ineligible for the Lottery, informing them that their only recourse is to file lawsuits such as this one (presumably before this week's Lottery). Both the Illinois Legislative Black caucus and the Latino caucus have already called via a public letter to Gov. Pritzker to suspend the Lottery pending an investigation.

The Department's decision to go forward with a plan to ram through more than a billion dollars in licenses to a group of 21 politically-connected insider companies without providing the 700+ unsuccessful applicants any meaningful opportunity to

1

challenge their ineligibility cannot be permitted. This is particularly so here. First, there are serious, obvious, and objectively verifiable problems with the way the Plaintiffs' applications were scored such that Plaintiffs should have been allowed to participate in the Lottery too. Second, the Department has flagrantly violated the law in denying Plaintiffs their statutorily-required notice and opportunity to cure any defects in their applications. *Shockingly, Plaintiffs have already identified six (6) other applicants to whom the Department sent a deficiency notice explaining to those applicants how to fix within 10-days problems the Department identified with their proposed floor plan – the exact same issue for which the Department later docked Plaintiffs' scores without sending Plaintiffs any similar notice to cure.* Because there can be no confidence in the entire process, injunctive relief is necessary to prevent the Lottery from taking place until the Court can chart the proper course.

## I.    Factual Background

In 2014, the General Assembly passed a law to award licenses to a limited number of companies to sell medical marijuana in Illinois. Called the Compassionate Use of Medical Cannabis Act, the law created a system of licensing dispensaries to sell cannabis to patients suffering from certain conditions. 410 ILCS 130/1. The Department was placed in charge of the licensing. *Id.*

Unlike some states in which there are an unlimited number of dispensary licenses, Illinois chose to strictly limit the number of available licenses. See Exhibit 1, Declaration of Michael Kanovitz, at 2. That limitation has made these licenses extremely valuable. In the past year, some owners of existing licenses have sold single dispensaries for more than $20 million. *Id.*

2

In 2019, the General Assembly passed a new law, creating rights to up to 60 new "Early Approval" secondary site dispensary licenses. 410 ILCS 705/15-15. The Act as amended provides that the only people eligible to win the 60 new Early Approval dispensary licenses are the people who already owned companies holding existing dispensary licenses. *Id.* It appears that the only companies with existing dispensary licenses are majority-owned by white males. Zero, or close to zero, companies with existing licenses are majority-owned by women or by minorities. Exh. 1 at 3.

There was considerable outcry over the decision to award the next 60 dispensary licenses to the same people who already owned the existing dispensaries; one of the criticisms was that this effectively shut out of the cannabis industry many business owners and entrepreneurs from disadvantaged communities most effected by the War on Drugs. *Id.* at 4. To try to justify this unequal distribution of valuable State resources in the face of considerable public backlash, the Act provides that minority- and female-owned businesses, while ineligible for any of the 60 Early Approval licenses, would nonetheless be eligible to apply for a third round of dispensary licenses, consisting of 75 Conditional Adult Use licenses (hereafter, the "Licenses"). *See* 410 ILCS 705/15-25(a).

In 2019, the Department announced a process to award these 75 Licenses. Companies could apply and would be graded on various measures, with up to 252 total points. Exh. 1 at 6. Via a no-bid, $4.2M contract, the Department selected KPMG to grade the applications. *Id.*

### The State's Social Equity Promises

The State and its Governor promised that this Act and this round of new

3

licenses would open up legal cannabis to social equity applicants who had been traditionally excluded from this lucrative industry. *See, e.g.,* Exhibit 5, "Illinois Legalization Bill lands with Promised focus on Social Equity," Cannabiz Wire, 5/6/20; Exhibit 8, "Recreational Cannabis: Illinois Strives for Social Equity," Marijuana Venture, 2/10/20. The Act's sponsors declared that the next round of 75 Licenses would focus on people who lived in economically disadvantaged neighborhoods or who had been directly impacted by the War on Drugs. *Id.*

To facilitate their inclusion, the State announced that 50 of the 252 possible points would be awarded to applicants qualifying as Social Equity Applicants, meaning they were majority-owned by person(s) who lived in certain zip codes designated as disproportionately affected, employed such persons, or who had prior cannabis arrests. 410 ILCS 705/15-30(c)(5). The Act set a reduced application fee for Social Equity Applicants, dispensed with some of the traditional application requirements that could be barriers for people without money (such as owning property at the time of applying), and set up a $20M fund for low-interest loans to help any winning social equity applicants build their businesses. *Id.*

To further level the playing field, according to the Department's FAQs, many of the measures on which applicants were to be evaluated were designated to be graded via binary scoring, *i.e.*, pass/fail: the applicant either got all of the points, or did not. Exh. 1 at 6. Among the measures that were designated pass/fail included the applicant's experience, diversity plan, social equity and veteran status, and community plan. *Id.* By making the scoring on these key measures "check-the-box," the Department created a contest where applicants could not distinguish themselves

from the pack based on their diversity or community ties. The implication of such scoring is that many, if not most, applicants would receive maximum (tie) scores. *Id.*

Members of communities in need of economic development were encouraged to apply. Many did, some spending a year or more preparing applications for a chance to participate. Exh. 1 at 7. According to news accounts, numerous teams owned by true Social Equity Applicants invested considerable sums of hard-earned money in the process, sometimes their entire life savings. *Id.* As Toi Hutchinson, Gov. Pritzker's "Cannabis Czar," stated at the time: "…We remain unwavering in our commitment to ensuring these licenses are issued in a fair and objective way that implements Illinois' equity-centric law." Exhibit 9. Governor Pritzker himself stated: "Starting with Equity as our north star, this framework reflects some of our most deeply held priorities with legalization. Equity guided the conversation on every component of this process." Exhibit 5.

All told, more than 700 companies submitted a total of more than 4,000 applications. Many of those 700 companies, including Plaintiffs, were majority-owned by true Social Equity Applicants living in economically disadvantaged areas.

### The Plaintiffs

The Plaintiffs in this action consist of 21 different social equity applicants. Some are majority owned by social equity applicants from disproportionately affected communities, along with financial partners, but many of the Plaintiffs are wholly-owned by groups of social equity applicants who came together for the chance to break into the cannabis industry. Some examples of the latter (all who should have been sufficiently qualified to participate in the Lottery) include, for example:

Plaintiff Southshore Restore is 100% owned and controlled African American residents and business owners from the City's South Shore neighborhood. The team is made up of community organizers, environmental justice advocates, military veterans, urban farmers, small business owners and young professionals.

Plaintiff Heartland Greens is also 100% African American, mostly female, and led by Marquita Hollins, a military veteran. Residents of the City's West Side, the group was brought together for this opportunity by a wrongfully incarcerated man who posted a notice in his neighborhood barbershop about breaking into legal cannabis. Members include a Nutrition Educator at UIC, school board members, and employees of local community organizations.

Plaintiff Doobie Room is 100% owned and controlled by African American social equity military veterans. Their collective accomplishments include starting a nonprofit and business incubator for veterans, as well as running a successful multistate hemp company.

Plaintiff Lakeshore Greens is majority owned and controlled by African American long-time residents and business owners from Evanston. The team includes one member who runs a diversity and inclusion training program, two master gardeners who own a hemp production consulting company and who also run gardening programs for children, as well as the founder of an African American Archival History foundation.

Plaintiff Blounts & Moore is 100% owned and controlled by African American (and mostly female) business women. This team includes the first African-American woman to own a major furniture retail store in North Carolina.

6

Plaintiff PGW is owned and controlled by women with a decade of collective cannabis industry experience. Majority African American owned, this team has operated a cannabis cultivation and manufacturing facility, as well as active membership and leadership of multiple cannabis industry groups.

### The Lottery Process

There will be 75 Lotteries, one for each available license. For purposes of the Act, the State is divided into 17 Regions. For 16 of the Regions, one to four Licenses will be awarded via this Lottery process. For the Region covering Chicagoland, there will be 47 Lotteries for 47 Licenses. 410 ILCS 705/15-25; 68 Ill. Adm. Code 1291.50.

In December 2019, the Department posted emergency rules providing how to handle cases of ties for high score. Under the rules, all such applicants became eligible to participate in the Lottery (hereafter, "Tied Applicants"). 68 Ill. Adm. Code 1291.

### The Tied Applicants Announcement

On September 3, 2020, the Department published a list of Tied Applicants, all of whom scored the maximum 252 points. There were a grand total of only 21 companies, or less than 3% of the total number that applied, and a number of the 21 appear to have overlapping ownership.

Under the State's present plan, each of those 21 Tied Applicants will be allowed to participate in the Lottery drawings for Regions where they applied. Other than these 21 companies (most who will necessarily win more than one of the 75 available licenses) no other companies will be allowed to participate in the Lottery.

### Lack of Anonymity

Unlike almost every other graded competitions for cannabis licenses, this one

did not control for political influence or bias by scoring anonymously. The vast majority of states with competitions to award cannabis licenses (including the original rounds in Illinois) do so via a process that requires applicants to redact all references to the names and affiliations of their principals for grading purposes. Exh. 1 at 8.

Inexplicably, this competition was not graded anonymously. *Id.* The application and the FAQs were clear that the Exhibits that would allow KPMG to identify the principal officers of each applicant were to include all personal identifying information. Exh. 1 at 9. And unlike in other states where an anonymized email address was required for contact purposes through the deficiency process, applicants also received deficiency notices to their personal email accounts directly from KPMG, and used those same email addresses to log-in to the KPMG online portal to upload any exhibits for which they received a deficiency. *E.g.,* Exhibit 2.

### The 21 Selected Companies

The purpose of the Act may have been to bring true social equity to the Illinois cannabis market, but, that is definitely not the way things worked out. *See* Exhibit 3, Sun Times, 9/6/20, "Marijuana show finalists include firms backed by ex-top cop Terry Hillard, restaurateur Phil Stefani: 'Doesn't sound like social equity.'" Indeed, the 21 winners of the right to participate in the 75 individual Lotteries for these enormously valuable licenses appear to be almost exclusively, if not entirely, politically-connected insiders.

Based on their corporate registrations, these include, for example, separate groups owned by a former Superintendent of the Chicago Police Department; Illinois gaming operators, including the president of Lucky Lincoln Gaming, a slot machine

company, partnered on the application with a Senior analyst in Illinois government;
the Executive Director of the lobbying group for cannabis in Illinois; the owner of a
private equity/real estate fund; the owner and namesake of an iconic Gold Coast
restaurant/brand teamed up with several politically-connected individuals, including
the former Director of Operations for the Illinois House Republican Organization; a
Democratic Committeeman who is also a lobbyist; and three separate groups
associated with the law firm of Bob Morgan, the original Governor-appointed
Director for the Illinois Medical Cannabis Program. *See* Exhibits 3 & 4.[1]

According to his web bio, Morgan was one of the primary architects who
created not only the Illinois cannabis program itself, but the original "selection
process for licensed dispensary facilities." Exh. 1 at 10. Hiring the law firm of a
tied-in lobbyist is obviously not a crime, but it bears note that a *minimum of*
one-seventh of the winners (3 of the 21) appear to have retained the firm of someone
who not only had top-tier connections, but may well have had additional insight into
the "secret-formula" maximum scoring process, a process that only 21 out of 700+
companies were somehow able to navigate successfully. Exhibit 4 (Grown In article).

Also, at least one Tied Applicant lists as a Manager a person identified on
LinkedIn as an employee of KMPG, the contractor that decided (not anonymously)
which very few companies would participate in the Lottery. Id. at 11. This, too, merits
additional investigation.

Though all have social equity partners, there appear to be at most one or two
wholly-owned social equity companies. Even more curious, very few of the 21 have any

---

[1] The same registered agent for each of Clean Slate Opco LLC, Dealership LLC, and V3 Illinois
Vending LLC, is lawyer in Morgan's firm.

obvious connected to the cannabis industry, begging the question of what metric could have justified their selection from among the 700+ others.

In a letter to Gov. Pritker, the Legislative Black and Latino caucuses have each already called for the Administration to suspend the lottery "over concerns about an applications process that allowed many clouted and seemingly well capitalized businesses to move onto the next phase." *See* Exhibit 3, Sun Times, 9/6/20.

### Administrative Review

The Department opted to announce their decision on the 21 companies shortly before the Labor Day weekend. Pursuant to the Emergency Rules promulgated and announced by the Department, the Lottery for issuing the Licenses will be held at least five business days after the Tied Applicant list was released. *See* 68 Ill. Adm. Code 1291.50(c)(1). That could be as soon as Friday, September 11, 2020.

However, to date the Department has released no information or explanation for why the 700+ unsuccessful applicants (who filed 4,000+ separate applications) were not selected for the Lottery, or why the 21 Tied Applicants were. Exh 6.

The Emergency Rules provide, and the Department announced on its website, that there will be no process for agency administrative review, and that all applicants not selected for the Lottery have no recourse other than to file lawsuits. 68 Ill. Adm. Code 1291. Having established a procedure where the State is going to give away more than a billion dollars of valuable Licenses to what appears to be a group of 21 connected insiders, the State has thus decided to deny the 700+ unsuccessful applicants any ability to timely challenge the process by which they were not selected to participate in this Lottery, other than by filing lawsuits such as this one. *Id.*

### The Need for TRO/Injunctive Relief

State law authorized a total of only 75 Licenses. There is no statutory authorization to award more Licenses during this round. 410 ILCS 705/15-25. If the Lottery proceeds and these Licenses are awarded, the winning Lottery applicants begin the process of building their dispensaries. The Department will undoubtedly argue down the road that there is no ability to make-whole (award a new License) any unsuccessful applicants who can subsequently prove that they should have been permitted to participate in the Lottery. There are no more Licenses.

### Denial of Plaintiffs Due Process

Each of the Plaintiffs should have qualified to be a Tied Applicant. Each Plaintiff was majority-owned by Social Equity Applicants, and each Plaintiff is qualified to operate a dispensary business. Plaintiffs all submitted applications that should have received all of the available points. Exh. 1 at 12.

On September 3, 2020, the same day the Department announced the 21 Tied Applicants, the Defendant informed Plaintiffs and others that they were not among the Tied Applicants, and thus ineligible to participate in the Lottery. A copy of the Department's determination notification, which was apparently identical for each of the 4,000+ unsuccessful applicants, is attached hereto as Exhibit 6. The Department's notice provided no explanation, nothing about Plaintiffs' scores, and no reasons or even information about why they had not been deemed a Tied Applicant. *Id.*

The same day they were informed that they were not Tied Applicants eligible for the Lottery, Plaintiffs' counsel made a request to the Department for information so they could assess the merits of claims for judicial review before the impending

11

Lottery. Exhibit 7. The information sought included Plaintiffs' scores and scorecards, the scoring rubric and evaluation criteria, any or all documents memorializing the reasons/rationale why Plaintiffs did not score enough points to become Tied Applicants, and any and all documents relating to the scores of those that did. *Id.*

The Department has since responded to only one portion of the request, sending one of the Plaintiffs ("JG IL") a scorecard showing how it was scored. (As of the date of this filing, none of the other Plaintiffs have been provided their scores). Even a cursory review of the JG IL scorecard reveals that the scoring process was fatally flawed.

### Objective Scoring Errors

The score attributed to JG IL is obviously wrong. First, JG IL submitted identical applications in all of the 75 regions, but at least one of the scores it received on certain measures in one of the Regions was different from scores for the same measure in other Regions. For example, JG IL received 16 out of 16 possible points for most of its recall plans (a/k/a "Exhibit G" to the application) but only a 14 out of 16 with the identical recall plan in the Rock Island Region. In other words, identical application plans, different scores. Exh. 1 at 13.

More troublingly, JG IL received zero points out of a possible 5 points for being majority-owned by Illinois residents. This makes no sense. JG IL is majority-owned by Illinois residents, and it submitted all of the required proof with its application in the form specified by the Department. The decision to award JG IL zero points on this measure is inexplicable, and suggests a fatally incompetent process. *Id.* at 14.

Similarly, JG IL also received zero points out of a possible 55 points for being majority owned by military veterans and for having Social Equity Status. These are

also incorrect. JG IL is majority-owned by military veterans and was a qualifying Social Equity Applicant, and it submitted all of the required proof with its application in the form specified by the Department. *Id.* at 15.

Correcting these obvious administrative errors, JG IL would have received the maximum points and been eligible to participate in the Lottery but for one other measure. The only other place on the application where JG IL lost any points is the floor plan (a/k/a "Exhibit J"). The Department did not inform JG IL why it did not receive the maximum points on this element, see Exh. 6, but JG IL's floor plan should have. The Act specifies that no property is required (to facilitate Social Equity Applicant competitiveness), and the Department's FAQ's specifically state that no additional points are awarded for applicants that apply with property. JG IL's floor plan is thus no less qualified than any other company's floor plan. Exh. 1 at 12.

The problem here is that by the time Plaintiffs are able to adjudicate the Department's errors, and even if they are able to demonstrate to the Court's satisfaction that they should have received all the points, the Lottery will have already taken place, and the Licenses awarded. Even more problematic, the Department has ignored the express language of the Act providing that applicants must be given the opportunity to cure before the licenses are awarded.

### The Mandatory Statutory Right to Cure

Given the concern that incumbent cannabis companies were going to have superior ability to score the maximum points (based in part on prior experience with similar contests), the Act expressly and clearly provides that applicants are entitled to the opportunity to cure any shortcomings in their applications. 410 ILCS 705/15-

30(b). That requirement states as follows:

> If the Department receives an application that fails to provide the required elements contained in this Section, the Department **shall issue** a deficiency notice to the applicant. The applicant **shall have** 10 calendar days from the date of the deficiency notice **to resubmit the incomplete information.** Applications that are still incomplete after this opportunity to cure will not be scored and will be disqualified.

410 ILCS 705/15-30(b) (emphasis added). Along the same lines, and for the same reasons, the dispensary application itself states on its face:

> If the Division receives an application that is **deficient in any respect**, the Division will issue a deficiency notice via e-mail to the primary and alternate contacts identified on the application form. The applicant will have 10 calendar days from the date the deficiency notice is sent to submit the information requested. If the applicant does not provide all required information necessary to make its application complete within the allotted time, the application will be rejected and not considered for a license, and the application fee will not be returned.

See Exh. 1 at 16.

Critically, in practice, the Department correctly interpreted the Act to require it to provide applicants an opportunity to cure any shortcomings in the applications as submitted. For example, Plaintiff has identified no fewer than *six different applicants* (none Plaintiffs in this action) who received a notice from the Department during the grading period dated May 1, 2020 under the subject line "Notice of Deficiency in Dispensary Application," which provided notice that this applicant's floor plan (Exhibit J) was missing elements, and an opportunity to provide corrections. Some are attached as Exhibit 2. To illustrate, one of these notice states in relevant part (yellow highlighting added):

> This e-mail serves as your notification that one or more deficiencies have been identified in your application for a Conditional Adult Use Dispensing Organization License.  Please carefully read the instructions below and submit the information addressing the identified deficiencies.

14

You have **10 calendar days** beginning the day after the date this e-mail was sent to submit the required information in the manner described below. Submissions delivered to the Illinois Department of Financial and Professional Regulations by any other means or after this timeframe will not be accepted. ****

IMPORTANT: If you do not submit the required information in the required manner within 10-calendar days, your entire application will not be scored and will be disqualified. (410 ILCS 705/15-30(b)). You will NOT receive a refund of your application fee.

Below, are the deficiencies in your application that have been identified at this time. This may not be a complete list of all deficiencies in your application, so please continue to monitor your e-mail account for additional correspondence regarding other deficiencies that may be identified in the future.

Instructions for Submitting Information to Address Deficiencies:

1. Review the list below to learn which deficiencies apply to your application.

2. Prepare responses in PDF format addressing each deficiency. A separate PDF document should be created for each Exhibit in which a deficiency has been identified. **** For each corrected Exhibit, title the document "Exhibit [letter of exhibit]_[Organization FEIN Number or Organization Name]_Deficiency_[Region ID(s) separated by underscores]."

File Naming Convention Example: Exhibit N_81-3780373-Deficiency_1_4_10_17
         ****

3. Once you've assembled your PDF responses, you will access the Secure File Transfer Protocol (SFTP) file as described in the information below with the following username and password. For SFTP related questions only, please contact the following email address: us-advIDFPR@kpmg.com and a resource will get back to you promptly. We recommend logging into the SFTP as soon as possible to determine any access issues as extensions to submit your content beyond the 10 calendar days will not be provided.
         ****

Listing of alphabetical deficiencies in your Application as provided by Section 15-30(b) of the Cannabis Regulation and Tax Act:

BLS Region:  *** Cape Girardeau

Exhibit F

The proposed business plan did not include the requirement for an estimated volume of cannabis the applicant plans to store at the dispensary.

Exhibit H

The application did not include the requirement for an executed contract with a private security contractor.

15

Exhibit J [Floor Plan]

The application did not include the requirement for a description of the features that will provide accessibility as required by the ADA.

The application did not include the requirement for a description of the air treatment systems that will be installed to reduce odors.

The application did not include the required statement that the issuance of a license will not have a detrimental impact on the community in which the applicant wishes to locate.

Exhibit P

The application did not include evidence which establishes the applicant's status as a Social Equity Applicant. In particular, the application did not provide sufficient evidence that:

• One or more persons asserting they resided in a disproportionately impacted area for at least 5 of the preceding 10 years did not provide sufficient documentation to support that assertion, and/or did not provide sufficient documentation that the individual owns and controls a sufficient percentage of the dispensing organization alone or in conjunction with other proposed principal officers to qualify as a Social Equity Applicant.

and/or

• The applicant did not provide sufficient evidence to support its assertion that it is an Illinois resident.

In your response please provide all relevant documents, combined in one searchable PDF file, by exhibit to support your assertion(s).

*See* Exhibit 2.

Each of the six applicants that received this notice, in other words, were

informed back in May 2020 (months before scoring) not only that the Department

deemed its proof of ownership insufficient, but the Department listed for this

applicant *the precise things that were missing from the "Exhibit J" floor plan element,*

*among others, that were required to achieve the maximum score. Id.* The Department

told these applicants exactly what they needed to do to get the missing points, *and it gave them 10 days to cure all of the problems without any prejudice to its application*, almost six months after the original deadline for submission, and before scoring it. *Id.*

Unlike these others, Plaintiffs got no such notification from the Department, and no such opportunity. Instead, the first time Plaintiff JG IL learned that the Department had any problem with Exhibit J to its application was when it received a less than perfect score on floor plan, thereby excluding it from the Lottery. Exh. 1 at 17. Not only did the Department serve the required notice too late to give Plaintiffs an opportunity to be heard, but it now threatens to hold the Lottery without them.

## II. A Temporary Restraining Order And Preliminary Injunctive Relief Is Appropriate Here

To justify a TRO and preliminary injunctive relief, Plaintiffs must demonstrate that they will suffer irreparable harm, inadequacy of a remedy at law, and likelihood of success on the merits. *Hoban v. Wexford Health Sources, Inc.,* 731 Fed. Appx. 530, 532 (7th Cir. 2018). Each of these is easily demonstrated here.

### A. Absent Injunctive Relief From The Court, Irreparable Harm Will Result

The way the process has been set up by the Department, Plaintiffs have no opportunity to challenge the denial of their eligibility to participate in the Lottery, other than by lawsuits like this one. By design, the Emergency Rules provide that there is no administrative review. Exh. 1 at 18.

More to the point, once the Lottery takes place, the Department will argue there is no remedy available to Plaintiffs. Even if Plaintiffs were subsequently able to show to the Court's satisfaction that they were improperly excluded from the Lottery, not only will they be unable to prove that they definitely would have

obtained a License (no one would know if they would have won the Lottery) but it will be too late to give them a License anyway: by law, there are only 75 Licenses, and they will have already been awarded, with the build-out and permitting processes having already begun. This is thus precisely the sort of case where Plaintiffs will suffer irreparable harm absent injunctive relief. *See City of Fremont v. F.E.R.C.*, 336 F.3d 910, 914 (9th Cir. 2003) (plaintiff showed irreparable injury for purposes of immediate review of agency decision as plaintiff would lose the ability to compete for a limited license in accordance with pre-existing agency rules); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (lost chance to pursue chosen profession can constitute irreparable harm); *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 372 (8th Cir. 1991) ("A preliminary injunction both protects this interest in participating in a legal bidding process and ensures that the contract awarded will be a legal one."); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) ("Appellants are in danger of losing the opportunity, which the evenhanded operation of the Williams Act guarantees them, to attempt to acquire Bendix stock. Such loss could not be compensated by money damages."); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (lost chance to pursue chosen profession can constitute irreparable harm).[2]

---

[2] Nor is this the type of injury for which the State is liable for money damages. As the defense will no doubt point out, the State is immune from money damages. *Temple U. v. White*, 941 F.2d 201, 215 (3d Cir.1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the [state] clearly establishes that any legal remedy is unavailable and the only relief available is equitable in nature."); *Feinerman v. Bernardi*, 558 F.Supp.2d 36, 51 (D.D.C. 2008) (where plaintiff cannot recover money damages from the defendant due to defendant's sovereign immunity, any loss suffered by plaintiff is deemed per se irreparable).

## B. Plantiffs Are Likely To Succeed on the Merits

Nothing about what the Department is doing here comports with due process. Where the State is awarding enormously valuable Licenses to politically-connected insiders, the Constitution requires there to be at least some opportunity for meaningful review, whether administrative or judicial. The hallmark of due process is an opportunity to be heard at a meaningful time. The State cannot simply ram through a process that benefits politically connected insiders without affording those deemed ineligible any ability to challenge their exclusion from that process until after it is too late to obtain relief. *See Dupuy v. Samuels*, 397 F.3d 493, 507 (7th Cir. 2005) (Approving preliminary injunction to provide child care workers with notice and an opportunity to address allegations before disclosing a report because "[t]he hallmark of due process is an opportunity to be heard at a meaningful time and in a meaningful manner.") (*citing Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)); *Johnson v. Morales*, 946 F.3d 911, 936 (6th Cir. 2020) (Reversing denial of preliminary injunction where government revoked business license after failing to provide notice of the basis for decision while replacing burden on plaintiff to demonstrate compliance); *O'Donnell v. Harris Cty.,* 892 F.3d 147, 164 (5th Cir. 2018) (Preliminary injunction appropriate to require state to give arrestees notice of the information needed to obtain bail and an opportunity to provide the information to an individualized decisionmaker); *Moseanko v. Yeutter*, 944 F.2d 418, 426 (8th Cir. 1991) (district court properly enjoined agency action for 30 days while it sent out "corrected notices and explanations of loan servicing options" to the affected plaintiffs).

Here, the statute clearly defined the process that all applicants are due: notice of any claimed deficiency and an opportunity to correct it. For the six applicants identified above, and presumably others, the Department provided both timely notice of a claimed deficiency in Exhibit J and an opportunity to cure it to obtain maximum points. Plaintiffs received neither. The first notice provided to Plaintiffs that the Department had identified any problem with this element was on September 3, at which time the Department simultaneously declared that its decision was final. The Court can and should issue an injunction to ensure that Plaintiffs receive the required process. *Id.; see also Blaine v. North Brevard Cty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1305 (M.D. Fla. 2018) (Plaintiffs demonstrated likelihood of success on the merits where defendant failed to follow its own bylaw procedures for a hearing).

In addition to due process, Equal Protection is also plainly implicated. Plaintiffs have stated colorable legal claims in that they were improperly treated differently when the Department expressly told others, but not them, how to achieve perfect scores and allowed those others to resubmit. This fails to comport with the Constitution under any and all levels of scrutiny. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074–75 (2000) (Disparately advantaging similarly situated applicants without basis violates equal protection "whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.") (citation omitted); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S. Ct. 706, 721, 102 L. Ed. 2d 854 (1989) (Requiring strict scrutiny where government denies certain citizens the opportunity to compete for fixed percentage of government contracts based on race); *Gordon v. United Airlines, Inc.*, 246 F.3d

20

878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.").

### C. Injunctive Relief Sought

Having created a regime that expressly disavows any opportunity for administrative review, and then compounded the urgency by trying to ram through the Lottery shortly after the Labor Day holiday (less than a week after informing Plaintiffs they are not going to be eligible), the Department has abdicated to the court system the responsibility to ensure that the process is fair. These are extremely valuable licenses. The result here is life-changing for most of the social equity applicants bringing this Motion, who have been working and investing their time for more than a year to try to break into the cannabis industry. They are entitled to some sort of basic fairness, including, at a minimum, the right to be heard on why these licenses should not be awarded until they have a chance to make their case in some forum in some format that they are Lottery-eligible too.

To that end, Plaintiffs seek narrow relief, or, in the alternative, more broad relief. On the narrower side, Plaintiffs respectfully request that that the Court order the Department to provide them the same notice-plus-opportunity-to-cure that was afforded to other applicants. Now that the Department has provided Plaintiffs with the statutorily-required notice of their applications' purported deficiencies, Plaintiffs have already acted quickly to correct any purported (but disputed) deficiencies, well within the statutorily allotted ten days. It is a very simple matter for the Department

to check these revised sections for sufficiency prior to the Lottery. If the Department will not do so voluntarily, the Court should order it to re-score their Exhibit J, and, if any of Plaintiffs' scores merit it (which it will), allow that applicant into the Lottery.

Should the Department for any reason resist this alternative, the Court should enjoin the Lottery from proceeding until the Department provides Plaintiffs (and any others who ask) an opportunity to challenge the scoring processes and the decision to exclude them from the Lottery, as well as the information with which to do so. Enjoining the Lottery pending that process is the only way to preserve Plaintiffs' ability to participate, should the Court at later point deem that course appropriate.

### A. The Department Having Now Provided Plaintiff The Required Notice of Deficiency, The Court Should Order The Department To Check The Plaintiffs' Scores To Determine Their Eligibility For The Lottery

As set forth above, the language of the Act is mandatory. By law, Plaintiffs "shall" receive the statutorily-required notice to "resubmit the incomplete information," prior to being scored or disqualified. 410 ILCS 705/15-30(b).

Here the Department attempted to determine Plaintiffs' score without providing them with this opportunity, despite having provided that very opportunity to other every other applicant Plaintiffs' counsel has asked. Those other applicants received notice months ago as to the Department's contention of precisely where and how their Floor Plan elements fell short of maximum points, and were given the chance to fix their applications to address the Department's notification. This was the appropriate process. The motivating concern behind this competition was to ensure that social equity applicants who were new to the industry had a legitimate opportunity to win these licenses, rather than award them to the

22

incumbent dispensary companies with sufficient cannabis experience to answer all questions correctly without help. Under all of the authority cited above, if some applicants were provided notice of exactly where and how they fell short of maximum points and an opportunity to cure, then the Department cannot selectively enforce the rules of the competition and arbitrarily deny other applicants the same notice and opportunity to resubmit.

Without conceding any problems with the originals, Plaintiffs have already created an updated version of Exhibit J, as well as the purportedly missing proof of residency, veteran, and social equity status (all of which had been previously provided in proper format). If the scorecard is deemed notice to Plaintiffs as to where their applications were deficient, they are prepared to immediately provide the updated Exhibits to the Department per the designated procedure, all well within the Act's 10-day notice-cure period.

The Court should order the Department to review Plaintiffs applications post-deficiency notice. It will not take the Department much time to confirm Plaintiffs' residency, veteran and social equity status. The recently submitted Exhibit J is only ten pages long. It surely would not take the Department more than an hour to check them. There is ample time to do so prior to the Lottery, which by law cannot proceed any sooner than Friday.

If the Court orders the Department to take these steps, this lawsuit will be fully resolved. To be clear, Plaintiffs are not asking the Court to put them in the Lottery. They are merely asking the Court to direct the Department to give them the legally-required opportunity that it gave to others: to be scored after having notice of the

23

Department's contentions and the chance to cure purported deficiencies. After Plaintiffs are scored, the law and proper process will have been followed, and Plaintiffs either will or will not join the other companies eligible for the Lottery. No additional relief is sought.

If, on the other hand, it is the Department's position that there is insufficient time or will to evaluate Plaintiffs' eligibility, and if the Court is not inclined to order the Department to do so, then the process should be paused long enough to ensure fair and deliberate consideration of the very important issues raised herein. In that event, Plaintiffs request alternative relief as follows.

### B. Alternatively, The Court Should Enjoin The Lottery Until Such Time As Plaintiffs Can Be Fully Heard *De Novo* On Their Claims That They Have Been Improperly Excluded

By expressly foreclosing administrative review, the Department kicked to the judiciary not only accountability for ensuring that the process for distributing these enormously valuable Licenses is fair, but also *de novo* responsibility for examining the scoring process itself, any potential conflicts of interest, and the correctness of the of the scores of Plaintiffs (and the winners).

At the same time, however, the Department seeks to compress the time for the judiciary to perform this function to just a few days. If it is too much to ask the Court to resolve all concerns prior to the scheduled Lottery, then the Department should not be permitted to proceed until the serious issues facing the Court have been considered and resolved. Those issues include, among others:

(a) the lack of due process wherein applicants are effectively denied any and all meaningful administrative and judicial review of ineligibility (or any possibility

of a real remedy) prior to awarding extremely valuable licenses that were supposed to include true/genuine Social Equity Applicants, not just politically connected insiders;

(b) whether the Department violated its statutory duty to provide Plaintiffs notice of purported shortcomings in their applications and ten days to cure them, and whether that failure constitutes a denial of due process;

(c) whether the Department violated Plaintiffs' right to equal protection by affording other applicants timely deficiency notices and the opportunity to cure;

(d) whether there was any impropriety associated with the decision to allow into the Lottery an applicant owned in part by an employee of KPMG (the company that conducted the grading), plus three other applicants with ties to the former Director who designed the original dispensary contest, both of whom may well have had insider advantages about how to achieve the elusive necessary score;

(e) how the scoring process was conducted, and why it was that 21 politically connected groups were selected over the other 700 who were not;

(f) how the Department decided which groups would or would not receive deficiency notices, and on which sections, and whether any of the 21 selected groups received ten-day opportunities to cure defects as to any substantive measures;

(g) why the Department gave Plaintiffs scores of zero on measures that they obviously satisfied (residency, veteran and social equity status) and whether the entire scoring process was marred by similar incompetence; and, most basically,

(h) whether Plaintiffs' applications as submitted did capture all of the available points, thus making them eligible for the Lottery.

25

These issues cannot just be waved away. Discovery is required to properly resolve many of them, followed by due consideration by the Court. If the Department is instead permitted to allow the Lottery to go forward, the Court's consideration will become moot, because the other applicants will have received municipal approvals and built their dispensaries, and there will be no licenses left to award if Plaintiffs later prove they were right. This is thus exactly the type of situation where a TRO to freeze the status quo would be appropriate.

## Conclusion

As is hopefully clear, Plaintiffs are not necessarily asking to postpone the Lottery process. As the Defendants are likely to point out, there are reasons to proceed forthwith, and recent statements by Department officials suggest that remains their intention. Given that, the simplest and most efficient outcome would be for the Court to simply order the Department to check the Exhibits recently submitted by Plaintiffs to see if they comply, an exercise that would take an hour or so, at most. That would moot this lawsuit – Plaintiffs' claims would be addressed, and they either would or would not be eligible for the Lottery.

If, however, the Department opposes that step, and if the Court is not inclined to order them to take it, then the only appropriate outcome is to suspend the Lottery (as has been called for by Illinois Legislative Black and Latino caucuses) until the issues raised herein can be resolved in an orderly fashion. The stakes are simply too high and life-changing for any other outcome, and on the other side of the coin, any need to rush to award the Licenses is insufficiently critical.

WHEREFORE, Plaintiffs respectfully request that the Court enter a TRO and preliminary injunction order as follows:

A.  Directing the Defendants to treat the Department's September 3, 2020 notification of non-perfect scores to each of the Plaintiffs as the required deficiency notice, and accept and grade Plaintiffs' revised Exhibits. And upon completing that review, if Plaintiffs' scores qualify for placement in the Lottery, Defendants should be further ordered to permit any Plaintiffs that do to participate.

Or, alternatively:

B.  Temporarily enjoin the Lottery from proceeding for as long as the Court deems necessary to address the issues raised in this Memorandum, including but not limited to whether the process for selecting the 21 Tied Applicants and excluding Plaintiffs was inherently flawed, marred by conflict of interest, erroneously executed, or for any other reason in need of revision.

Respectfully Submitted:

/s/ Jon Loevy

Jon Loevy
Michael Kanovitz
Loevy and Loevy (41295)
311 North Aberdeen Street
Chicago, IL 60607
(312) 243-5900

Dated: September 8, 2020

27