IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

SOUTHSHORE RESTORE, LLC; HEARTLAND GREENS )   Case No. 20-cv-5264
LLC; BLOUNTS & MOORE LLC; LAKESHORE        )
GREENS, LLC; THE DOOBIE ROOM LLC; BOTAVI   )   Hon. Judge Alonso
WELLNESS LLC; DEEP EARTH LLC; THE HEALING  )
SOURCE LLC; EMERALD COAST LLC; BIAMED LLC; )   CORRECTED AMENDED
NORTHSTAND DISPENSARY LLC; CANNABISTRO      )   COMPLAINT
LLC; PGW LLC; EMERALD ISLAND LLC; PRAIRIE  )
GRASS LLC; JG IL LLC; RENU LLC; TC APPLICO )
LLC; THIRD COAST GREENHOUSE LLC; KAP JG    )
LLC; CELESTIA LLC; VILL-OPS, INC.; LAND OF )
LINCOLN DISPENSARY, LLC; UHCC, INC.; SPARK )
ALLIANCE, LLC; WELL-BEING HOLISTIC GROUP,  )
LLC; CANNECT WELLNESS OF ILLINOIS, LLC;    )
KECHWA, LLC; LITTLE FISH, LLC; PARKWAY     )
DISPENSARY, LLC; HOLISTIC ILLINOIS, LLC;   )
CANNDID SPIRIT, LLC; EARTHLYCURE LLC;      )
PROJECT EQUITY ILLINOIS INC; FUTURE OF THE )
LEAF ENTERPRISES LLC; COUNTERPUBLIC LLC,   )
COUNTERBALANCE, LLC, CHICANN LLC; DIAMOND  )
STAR DISPENSARY, LLC; FOLIAGE 40 LLC;      )
ELEMENT 7 SOUTHSHORE; ELEMENT 7 EAST ST.   )
LOUIS; LEGACY COMMUNITY WELLNESS LLC; KANA )
GROVE NORTH ILLINOIS, LLC; KANA GROVE      )
SOUTH ILLINOIS LLC; ELEMENT 7 ENGLEWOOD    )
LLC; GREEN & FOSTER, LLC; GREEN & WILLIAMS,)
LLC, GREEN & BRASFIELD, LLC; GREEN & ALAMO )
LLC, GREEN & CAMPBELL LLC; GREEN & RANDLE, )
LLC; GREEN & KINNICK, LLC; GREEN & BRADLEY,)
LLC, CESAM, LLC; GREENLINE LLC; NK         )
HOLDINGS, LLC; NK HOLDINGS 2, LLC; NK      )
HOLDINGS 3, LLC; ZS HOLDINGS, LLC; ZS      )
HOLDINGS 2, LLC; ZS HOLDINGS 3, LLC;       )
NATURAL SELECTIONS 1, 2, 3, LLC; ABBYV,    )
LLC; LEROLERO, LLC.; CHIMBOMBO, LLC;       )
ILLINOIS ELEMENTAL HOLDINGS, LLC; NWA      )
HOLDINGS, LLC; NWA HOLDINGS 2, LLC; FMA    )
ILLINOIS, LLC; CHICAGO GREENZ, LLC; HOLY   )
ELIXERS, LLC; ZEN 1, 2, 3, 4, 5, LLC.;     )

V.
ILLINOIS DEPARTMENT OF FINANCIAL AND
PROFESSIONAL REGULATION; BRETT BENDER,
DEPUTY DIRECTOR, AND AS-YET UNKNOWN
DEFENDANTS

**AMENDED COMPLAINT**

Plaintiffs, SOUTHSHORE RESTORE LLC; HEARTLAND GREENS LLC;

BLOUNTS & MOORE LLC; LAKESHORE GREENS LLC; THE DOOBIE ROOM LLC; BOTAVI

WELLNESS LLC; DEEP EARTH LLC; THE HEALING SOURCE LLC; EMERALD COAST

LLC; BIAMED LLC; NORTHLAND DISPENSARY LLC; CANNABISTRO LLC; PGW LLC;

EMERALD ISLAND LLC; PRAIRIE GRASS LLC; JG IL LLC; RENU LLC; TC APPLICO

LLC; THIRD COAST GREENHOUSE; KAP JG LLC; CELESTIA LLC, VILL-OPS INC.;

LAND OF LINCOLN DISPENSARY, LLC;  UHCC, INC.; SPARK ALLIANCE, LLC;

WELL-BEING HOLISTIC GROUP, LLC; CANNECT WELLNESS OF ILLINOIS, LLC;

KECHWA, LLC; LITTLE FISH, LLC; PARKWAY DISPENSARY, LLC; HOLISTIC

ILLINOIS, LLC; CANNDID SPIRIT, LLC; EARTHLYCURE LLC; PROJECT EQUITY

ILLINOIS INC; FUTURE OF THE LEAF ENTERPRISES, LLC; COUNTERPUBLIC, LLC,

COUNTERBALANCE LLC, CHICANN, LLC; DIAMOND STAR DISPENSARY, LLC;

FOLIAGE 40 LLC; LEGACY WELLNESS, LLC; ELEMENT 7 SOUTHSHORE, ELEMENT

7 EAST ST. LOUIS; KANA GROVE SOUTH ILLINOIS LLC; ELEMENT 7 ENGLEWOOD

LLC; GREEN & FOSTER, LLC; GREEN & WILLIAMS, LLC, GREEN & BRASFIELD,

LLC; GREEN & ALAMO LLC, GREEN & CAMPBELL LLC; GREEN & RANDLE, LLC;

GREEN & KINNICK, LLC; GREEN & BRADLEY, LLC, CESAM, LLC; GREENLINE

LLC; NK HOLDINGS, LLC; NK HOLDINGS 2, LLC; NK HOLDINGS 3, LLC; ZS

HOLDINGS, LLC; ZS HOLDINGS 2, LLC; ZS HOLDINGS 3, LLC; NATURAL

SELECTIONS 1, 2, 3, LLC; ABBYV, LLC; LEROLERO, LLC.; CHIMBOMBO, LLC;

ILLINOIS ELEMENTAL HOLDINGS, LLC; NWA HOLDINGS, LLC; NWA HOLDINGS

2, LLC; FMA ILLINOIS, LLC; CHICAGO GREENZ, LLC; HOLY ELIXERS, LLC;

2

ZEN 1, 2, 3, 4, 5, LLC.; by their attorneys, hereby submit this Complaint against Defendants. In support of the relief requested herein, Plaintiffs state as follows:

## Introduction

1.    Next week, the State of Illinois, through the Illinois Department of Financial and Professional Regulation ("Department"), proposes to give away 75 cannabis dispensary licenses collectively worth more than $1,000,000,000 (billion) dollars to a group of 21 companies, many if not most owned by politically-connected insiders.

2.    Although there was purportedly an open competition to determine eligibility for these 75 licenses, the Department has announced plans to award the 75 licenses to these 21 companies by lot (hereafter, the "Lottery") without providing any opportunity for administrative or judicial review for the 4,000+ applicants whom the State has deemed ineligible to participate in the Lottery.

3.    The Department's decision to go forward with a plan to award more than a billion dollars in licenses to a group of 21 politically-connected insider companies without providing the 4,000+ unsuccessful applicants any opportunity to challenge their ineligibility is unconstitutional, and cannot be permitted.

4.    This is particularly so where, as here, there are serious, obvious and objectively verifiable problems with way the Plaintiffs' applications were scored. Accordingly, in conjunction

3

with this Complaint, Plaintiffs herein seek injunctive relief for the reasons specified below.

### Jurisdiction and Venue

4.    This court has jurisdiction pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1367, as Plaintiffs bring a federal claim arising under the United States Constitution as well as a state law claim so related as to form part of the same case or controversy. Venue is proper as the events giving rise to these claims occurred in this district, some of the Plaintiffs reside in this district and the agency Defendant maintains its offices in this district.

### Parties

5.    The Plaintiffs in this action consist of 21 different social equity applicants. Some are majority owned by social equity from disproportionately affected communities, along with partners, but more than half are wholly-owned by groups of social equity applicants who came together for the chance to break into the cannabis industry.

6.    Plaintiff Southshore Restore is 100% owned and controlled African American residents and business owners from the City's South Shore neighborhood. The team is made up of community organizers, environmental justice advocates, military veterans, urban farmers, small business owners and young professionals.

7.    Plaintiff Heartland Greens is also 100% African American, mostly female, led by Marquita Hollins, a military veteran.

4

Residents of the City's West Side, the group was brought together for this opportunity by a wrongfully incarcerated man who posted a notice in his neighborhood barbershop about breaking into legal cannabis. Members include a Nutrition Educator at UIC, school board members, and employees of local community organizations.

8.     Plaintiff Doobie Room is 100% owned and controlled by African American social equity military veterans. Their collective accomplishments include starting a nonprofit and business incubator for veterans, as well as running a successful multistate hemp company.

9.     Plaintiff Lakeshore Greens is majority owned controlled by African American long-time residents and business owners from Evanston. The team includes one member who runs a diversity and inclusion training program, two master gardeners who own a hemp production consulting company and who also run gardening programs for children, as well as the founder of an African American Archival History foundation.

10.     Plaintiff Blounts & Moore is 100% owned and controlled by African American (and mostly female) business woman. This team includes the first African-American woman to own a major furniture retail store in North Carolina.

11.     Plaintiff PGW is owned and controlled by women with a decade of collective cannabis industry experience. Majority

African American owned, this team has operated a cannabis cultivation and manufacturing facility, as well as active membership and leadership of multiple cannabis industry groups.

12.  Defendant Bret Bender is the Deputy Director of the Defendant Illinois Department of Financial & Professional Regulation (the "Department").

**Background**

13.  In 2014, the General Assembly passed a law to award licenses to a limited number of companies to sell medical marijuana in Illinois. Called the Compassionate Use of Medical Cannabis Act (the "Act"), the law created for the first time in Illinois a system of licensing dispensaries through which it would be legal to sell marijuana to patients suffering from conditions that are alleviated by marijuana. The Act places the Department in charge of the licenses.

14.  Unlike some states in which there are an unlimited number of dispensary licenses, Illinois chose to strictly limit the number of available licenses. That limitation has made these licenses extremely valuable. Some recipients of these licenses have sold their dispensaries for tens of millions of dollars.

15.  In 2019, the General Assembly amended the Act, creating rights to up to 60 new "Early Approval" secondary site dispensary licenses. 410 ILCS 705/15-15. Because, as described above, the State awarded 55 of the 60 available dispensary licenses in the original

6

round, there are likewise 55 businesses eligible for Early Approval secondary site licenses.

16.   The Act as amended provides that the only people eligible to win the 55 new Early Approval dispensary licenses are the set of people who already own companies holding existing dispensary licenses. As it turned out, the only companies with existing dispensary licenses are majority-owned by Caucasian males. Zero companies with existing licenses are majority-owned by women or by minorities.

17.   There was considerable public outcry over the decision to award the next 55 dispensary licenses to the same people who already owned the existing dispensaries, and one of the primary criticisms was that this decision effectively shut of the cannabis industry many small business owners and entrepreneurs in disadvantaged communities most effected by the War on Drugs.

18.   To try to justify this unequal distribution of valuable State resources, the amended Act further provides that minority-owned and female-owned businesses, while ineligible to apply for any of the 55 Early Approval licenses, would nonetheless be eligible to apply for a third round of dispensary licenses, consisting of 75 new Conditional Adult Use licenses, scheduled to be awarded before the end of 2021 (hereafter, the "Licenses").

19.   In 2019, the Department announced a process to award these 75 Licenses. To compete for them, companies could apply and would

be graded on various measures, with up to 252 total points.

20.   The Department selected KPMG via a no-bid, $4.2M contract to grade the applications.

21.   To facilitate participation in the nascent cannabis industry by people disproportionately affected by the War on Drugs, the State announced that 50 of the 250 possible points would be awarded to applicants who qualify as Social Equity Applicants, meaning that the company was majority-owned by person(s) who, for example, either lived in certain zip codes designated as disproportionately affected, or who had prior cannabis arrests.

22.   The Defendant, as well as the State and its Governor, promised that this round of new licenses was specifically designed diversify the cannabis industry and open it to Social Equity Applicants who had traditionally been excluded. Members of communities in need of economic development were encouraged to apply. Many did, investing considerable money, sometimes their entire life savings. Numerous teams made up of true Social Equity Applicants spent a year or more preparing applications for a chance to participate.

23.   The State announced a special fund to $20M fund help Social Equity Applicants finance their dispensary businesses in the event they won. Traditional rules that would have required applicants to own and control property during the application process (an expensive proposition) were waived.

8

24.   To further level the playing field, according to the FAQs published by the Department, many of the measures on which applicants were evaluated were designated to be graded via binary scoring, *i.e.*, pass/fail: the applicant either got all of the points, or did not. Among the measures that were designated pass/fail included the applicant's experience in cannabis, its diversity status, social equity and veteran status, and its community plan.

25.   By making the scoring on these key measures binary, the Department created a contest where applicants could not distinguish their credentials on factors such as experience, diversity, and community involvement. The implication of such a scoring system is that many, if not most, applicants would receive maximum (tie) scores.

26.   More than 700 companies submitted a total of more than 4,000 applicants. Many of those 700 companies, including the Plaintiffs, were majority-owned by true Social Equity Applicants who live in economically disadvantaged areas.

27.   In August of 2020, the Department announced emergency rules providing for what would happen if there was a tie for the highest scoring applicants. All such applicants thus became eligible to participate in the Lottery (hereafter, "Tied Applicants").

28.   For purposes of the Act, the State is divided into 17 Regions. For most of the State's Regions, the Department will award one to three licensees via this Lottery process. The primary exception

was the Region covering the greater Chicagoland area, for which there 47 Lotteries will be held to award the 47 Licenses.

29.   Applicants were allowed to file as many applications as they desired (at the cost of $2,500 per application for Social Equity Applicants) but Tied Applicants are only eligible to enter into and participate in the Lottery the same number of times as there are Licenses available for that Region. In other words, for a Region with two Licenses available, all Tied Applicants who applied in that Region are allowed to participate in that Lottery a maximum of two times.

30.   On September 3, 2020, the Department published a list of Tied Applicants, all of whom scored the maximum 252 points. There were a grand total of only 21 companies, or less than 3% of the total number that applied, and a number of them appear to have overlapping ownership.

31.   Under the State's present plan, each of those Tied Applicants who applied in a given Region will be allowed to participate in the 75 Lottery drawings by which these 75 Licenses will be awarded by lot. Other than these 21 companies, who will each win multiple licenses, no other companies will be allowed to participate in the Lottery.

32.   Unlike most graded competitions for cannabis licenses, this one did not control for political influence or bias by scoring anonymously. The vast majority of states that conduct competitions to

award cannabis licenses do so via a process that requires applicants to redact the names and affiliations of their principals from the graders for grading purposes.

33.     Inexplicably, this competition was not graded anonymously. The application and the FAQs were clear that the Exhibits that would allow KPMG to identify the principal officers of each applicant were to include all personal identifying information. And unlike in other states where an anonymized email address was required for contact purposes through the deficiency process, applicants also received deficiency notices to their personal email accounts directly from KPMG, and used those same email addresses to login to the KPMG online portal to upload any exhibits for which they received a deficiency.

34.     Based on their corporate registrations, at least some of the 21 Tied Applicants declared eligible for these enormously valuable licenses (collectively worth more than a billion dollars) are politically-connected. These include, for example, separate groups owned by a former Superintendent of the Chicago Police Department; Illinois gaming operators, including the president of Lucky Lincoln Gaming, a slot machine company, partnered on the application with a Senior analyst in Illinois government; the Executive Director of the Illinois cannabis lobbying group, NORML; the owner of a private equity/real estate fund; the owner and namesake of an iconic Gold Coast

11

restaurant/brand teamed up with several politically-connected individuals, including the former Director of Operations for the Illinois House Republican Organization; a Democratic Committeeman who is also a lobbyist; and three separate groups associated with the law firm of Bob Morgan, the original Governor-appointed Director for the Illinois Medical Cannabis Program.

35. According to his web bio, Morgan was one of the primary architects who created not only the Program itself, but the original "selection process for licensed dispensary facilities." Exh. 1 at 10. Hiring the law firm of a tied-in lobbyist is obviously not a crime, but it bears note that a minimum of one-seventh of the winners (3 of the 21) appear to have retained the firm of someone who not only had top-tier connections, but may well have had additional insight into the "secret-formula" maximum scoring process, a process that only 21 of 700+ companies were somehow able to navigate successfully.

36. Additionally, at least one Tied Applicant lists as a Manager a person identified on LinkedIn as a risk consultant for KMPG, the contractor that decided (not anonymously) which very few companies would participate in the Lottery.

37. There appear to be at most one or two true, wholly-owned social equity companies. Even more curious, very few of the 21 have any obvious connected to the cannabis industry, begging the question of what metric could have justified their selection from among the 700+

12

others.

38.   In a letter to Gov. Pritker, the Legislative Black and Latino caucuses have each already called for the Administration to suspend the lottery "over concerns about an applications process that allowed many clouted and seemingly well capitalized businesses to move onto the next phase."

39.   Pursuant to the Emergency Rules promulgated and announced by the Department, the Lottery for issuing the Licenses will be held at least five business days after the Tied Applicant list was released, which was shortly before the Labor Day weekend. That could be as soon as Friday, September 10, 2020.

40.   However, to date the Department has released no information or explanation for why the 4,000+ unsuccessful applicants were not selected for the Lottery, or why the 21 Tied Applicants were selected.

41.   For those applicants not among the 21 selected for the Lottery, the Department has announced on its website that there will be no process for agency administrative review, and that all such applicants not selected for the Lottery have no recourse other than to file lawsuits.

42.   Having established a procedure where the State is going to give away more than a billion dollars of valuable Licenses to what appears to be a group of 21 politically-connected insiders, it is

unconstitutional to deny the 4,000+ unsuccessful applicants any ability to timely challenge the process by which they were not selected to participate in this Lottery. Due process requires a procedure be made available in time to obtain a meaningful remedy by participating in the Lottery process.

43. Moreover, state law authorized a total of 75 Licenses; there is no statutory authorization to award more Licenses. If the Lottery proceeds and these Licenses are awarded, the winning applicants begin the process of building their dispensaries. The Department will likely argue that there is no ability to make whole (award a new License) to any unsuccessful applicants who can subsequently prove they should have been permitted to participate in the Lottery, much less that they would have won a License by lot.

44. Each of the Plaintiffs should have qualified to be Tied Applicant. Each Plaintiff was majority-owned by Social Equity Applicants, and each Plaintiff is qualified to operate a dispensary business. Plaintiffs all submitted applications that should have received all of the available points.

45. On September 3, 2020, the same day the Department announced the 21 Tied Applicants, the Defendant informed Plaintiff and others that they were not a Tied Applicant, and thus ineligible to participate in the Lottery. A copy of the Department's determination notification, which was apparently identical for each of the 4,000+

14

unsuccessful applicants, is attached hereto as Exhibit A. The Department provided no explanation, no information about Plaintiffs' scores, and no reasons or even information about why they had not been deemed a Tied Applicant.

46.  The same day they were informed that they were not Tied Applicants eligible to participate in the Lottery, Plaintiffs made a written request on the Department and its Director for information so they could assess the merits of their claims for judicial review. The information sought included Plaintiffs' scores and scorecards, the scoring rubric and evaluation criteria, any or all documents memorializing the reasons/rationale why Plaintiffs did not score enough points to become Tied Applicants, and any and all documents relating to the scores of those that did.

47.  The Department has since responded to only portion of this request, transmitting to one of the Plaintiffs ("JG ILL") a scorecard showing how it was scored.

48.  The score attributed to JG ILL is obviously flawed. First, JG ILL submitted identical applications in all of the 75 regions, but at least some of the scores it received on certain measures in some of the Regions were different from scores for the same measure in other Regions. For example, JG ILL received a 16 out of 16 for most of its recall plans (Exhibit G) but only a 14 out of 16 in the with the identical recall plan in the Rock Island Region. In other words,

identical application plans, different scores.

49.   More troublingly, JG ILL received zero points out of a possible 5 points for being majority-owned by Illinois residents. This makes no sense. JG ILL is majority-owned by Illinois residents, and it submitted all of the required proof with its application in the form specified by the Department. The decision to award JG ILL zero points is absurd, and suggests an extremely incompetent process.

50.   JG IL also received zero points out of a possible 5 points for being majority owned by military veterans. This is also incorrect. JG ILL is majority-owned by military veterans, and it submitted all of the required proof with its application in the form specified by the Department.

51.   JG IL also received zero points out of a possible 50 points for Social Equity Status. This is also incorrect. JG ILL qualified as a Social Equity Applicant, and it submitted all of the required proof with its application in the form specified by the Department.

52.   The only other measure for which JG ILL was docked any points is "Exhibit J" regarding the floor plan. The Department did not inform JG ILL why it did not receive the maximum points on this element, but JG ILL's floor plan should have received the maximum points. The Act specifies that no property is required (to facilitate competitive applications by Social Equity Applicants), and the Department's FAQ's

16

specifically state that no additional points are awarded for applicants that apply with property. JG ILL's floor plan is thus no less qualified than any other company's floor plan.

53.    The Act states that applicants get opportunity to cure any deficiencies with their applications. Specifically, 410 ILCS 705/15-30(b) states as follows (emphasis added):

If the Department receives an application that fails to provide the required elements contained in this Section, the Department **shall issue** a deficiency notice to the applicant. The applicant **shall have** 10 calendar days from the date of the deficiency notice **to resubmit the incomplete information.** Applications that are still incomplete after this opportunity to cure will not be scored and will be disqualified.

54.    The dispensary application itself states (emphasis added):

If the Division receives an application that is **deficient in any respect,** the Division will issue a deficiency notice via e-mail to the primary and alternate contacts identified on the application form. The applicant will have 10 calendar days from the date the deficiency notice is sent to submit the information requested. If the applicant does not provide all required information necessary to make its application complete within the allotted time, the application will be rejected and not

17

considered for a license, and the application fee will not be returned.

55.   In practice, the Department correctly interpreted the Act to require it to provide applicants an opportunity to cure any shortcomings in the applications as submitted.

56.   For example, six other applicants (not Plaintiffs in this action) received a notice from the Department during the grading period dated May 1, 2020 from FPR.AdultUseCannabis@illinois.gov under the subject line "**Notice of Deficiency in Dispensary Application.**" An illustrative example of this notice states in relevant part:

This e-mail serves as your notification that one or more deficiencies have been identified in your application for a Conditional Adult Use Dispensing Organization License.  Please carefully read the instructions below and submit the information addressing the identified deficiencies.

You have **10 calendar days** beginning the day after the date this e-mail was sent to submit the required information in the manner described below. Submissions delivered to the Illinois Department of Financial and Professional Regulations by any other means or after this timeframe will not be accepted. In your submission, do not include any supplemental information related to your application other than that required to address the identified deficiencies. Such supplemental information will not be considered in the review and scoring process. Please note that deficiencies identified are not comprehensive of all applicable statutes identified in the Cannabis Regulation and Tax Act (410 ILCS 705/).

**IMPORTANT: If you do not submit the required information in the required manner within 10-calendar days, your entire application will not be scored and will be disqualified.** (410 ILCS 705/15-30(b)). You will **NOT** receive a refund of your application fee.

Below, are the deficiencies in your application that have been identified at this time. This may not be a complete list of all deficiencies in your application, so please continue to monitor your

e-mail account for additional correspondence regarding other deficiencies that may be identified in the future.

**Instructions for Submitting Information to Address Deficiencies:**

1. Review the list below to learn which deficiencies apply to your application.

2. Prepare responses in PDF format addressing each deficiency. A separate PDF document should be created for each Exhibit in which a deficiency has been identified. Unless the deficiency is that an entire Exhibit is missing, only submit supplemental information and materials that address the deficiency identified. For each corrected Exhibit, title the document "Exhibit [letter of exhibit]_[Organization FEIN Number or Organization Name]_Deficiency_[Region ID(s) separated by underscores]."

**File Naming Convention Example:** Exhibit N_81-3780373-Deficiency_1_4_10_17

****

3. Once you've assembled your PDF responses, you will access the Secure File Transfer Protocol (SFTP) file as described in the information below with the following username and password. For SFTP related questions only, please contact the following email address: us-advIDFPR@kpmg.com and a resource will get back to you promptly. We recommend logging into the SFTP as soon as possible to determine any access issues as extensions to submit your content beyond the 10 calendar days will not be provided.

****

**Listing of alphabetical deficiencies in your Application as provided by Section 15-30(b) of the Cannabis Regulation and Tax Act:**

**BLS Region: *** Cape Girardeau**

Exhibit F
The proposed business plan did not include the requirement for an estimated volume of cannabis the applicant plans to store at the dispensary.
Exhibit H
The application did not include the requirement for an executed contract with a private security contractor.
Exhibit J

The application did not include the requirement for a description of the features that will provide accessibility as required by the ADA.

The application did not include the requirement for a description of the air treatment systems that will be installed to reduce odors.

The application did not include the required statement that the issuance of a license will not have a detrimental impact on the community in which the applicant wishes to locate.

Exhibit P

The application did not include evidence which establishes the applicant's status as a Social Equity Applicant. In particular, the application did not provide sufficient evidence that:

• One or more persons asserting they resided in a disproportionately impacted area for at least 5 of the preceding 10 years did not provide sufficient documentation to support that assertion, and/or did not provide sufficient documentation that the individual owns and controls a sufficient percentage of the dispensing organization alone or in conjunction with other proposed principal officers to qualify as a Social Equity Applicant.

and/or

• The applicant did not provide sufficient evidence to support its assertion that it is an Illinois resident.

In your response please provide all relevant documents, combined in one searchable PDF file, by exhibit to support your assertion(s)

57. The six applicants that received this and similar notice, in other words, were informed back in May (months before final scores were determined) not only that the Department deemed their proof of ownership insufficient, but it listed the various things that were missing from the Exhibit J floor plan element, among others, that were required to achieve the maximum score. Not only did the Department tell these applicants exactly what they needed to do, but it gave the applicants 10 days to cure all of the problems without any prejudice to their application, almost six months after the original deadline for submission.

58.    Plaintiffs got no such notification from the Department, and no such opportunity – and all despite the statutory requirements for both. Instead, the first time Plaintiff JG IL learned that the Department had any problem with its Exhibit J was when it received a less than perfect score, thereby excluding it from the Lottery.

59.    The Department cannot deprive any applicant of the rights specified in statute, much less selectively enforce the rules of this competition. If some applicants were provided notice of exactly where and how they fell short of maximum points and an opportunity to cure, then the Department cannot arbitrarily deny other applicants the same notice and opportunity to resubmit.

60.    The language of the Act is mandatory. Plaintiffs "shall" receive the statutorily required notice to "resubmit the incomplete information," prior to being scored or disqualified. 410 ILCS 705/15-30(b). Here the Department attempted to score Plaintiffs without providing them with notice and opportunity to respond, despite having provided that very opportunity to other applicants.

61.    The way the process has been set up by the Department, Plaintiffs are being denied any post announcement hearing to challenge the denial of their eligibility to participate in the Lottery.

62.    Absent emergency injunctive relief, by the time Plaintiffs have any opportunity for judicial review in this Court, they

will have no remedy. The State will argue that it is too late to afford them a License, because the Lottery will have already occurred, and the 75 dispensaries will be under construction. The State will further argue that there is no entitlement to damages because once the Lottery is over, Plaintiffs could never prove definitively that their lot would have been drawn entitling them to a License.

63.   This process does not comport with due process. Where the State is awarding enormously valuable Licenses to politically-connected insiders, there has to be be at least some opportunity for meaningful judicial review. Because the process here was specifically designed to avoid that opportunity, the Lottery should be enjoined until the State provides Plaintiffs (and all others who ask) an opportunity to challenge the Department's decision and the information with which to do so, as well as the ability to receive a chance for a license should the Court deem that appropriate.

### Count I - Due Process

64.   Plaintiffs reallege all allegations of this Complaint as if fully set out herein.

65.   By all of the above, Defendants, and each of them, are improperly denying Plaintiffs the statutory rights in the application process to which they are entitled.  Defendants are also denying Plaintiffs the right to participate in the lottery despite their satisfaction of the objective criteria to determine the participants.

22

Defendants refuse to give any process to challenge their actions. As a result, Plaintiffs are being deprived of property rights without due process of law and lack an effective remedy. Plaintiffs have been injured as a direct and proximate result.

66.   Plaintiffs are entitled to sufficient notice of the Department's findings of a deficiency(ies) and the basis therefore as well as an opportunity to respond with correction in accordance with the statutory procedures and the procedures afforded other applicants. Plaintiffs are also entitled to be notified of the basis, if any, underlying the Department's decision that they are not a Tied Applicant, and a fair hearing process to challenge that basis. Moreover, these processes must be afforded at a meaningful time when relief can still be effectively granted, *i.e.*, while Plaintiffs still have the oppostunity to participate in the Lottery.

67.   To preserve Plaintiffs' ability to obtain a remedy and this Court's ability to afford one, the Court should order the injunctive relief described below.

**Count II – Denial of Access to Courts**

68.   Plaintiffs reallege all allegations of this Complaint as if fully set out herein.

69.   Defendants are refusing to afford Plaintiffs a procedure at the agency level to challenge its failure to afford them

the deficiency notice and cure rights and its decision denying them Tied Applicant status.

70.   Although Defendants have invited all non-eligible applicants to file lawsuits to challenge the Department's conduct and decisions, Defendants intend to deprive the court of the ability to provide relief for any violation. Specifically, Defendants intend to award the Licenses before any court can act.

71.   By all of the above, Defendants, and each of them, are depriving Plaintiffs of access to court. If Plaintiffs prove a violation by the Department and entitlement to Tied Applicant status, the Department will contend that no Licenses will remain to be awarded such that this Court has no power to grant relief. Plaintiffs have been injured as a direct and proximate result.

72.   To remedy at least part of Plaintiffs' injuries, the Court should issue the injunctive relief demanded below.

**Count III — Equal Protection**

73. Plaintiffs reallege all allegations of this Complaint as if fully set out herein.

74.   Plaintiffs in this action were treated differently than other similarly situated applicants in that those other applicants were provided notice of deficiencies and an opportunity to respond to cure them, whereas Plaintiffs were not.

75.   Had Plaintiffs been given the same notice and permitted

24

the same opportunity to cure the stated deficiencies, whatever the Department is claiming them to be, Plaintiffs would have qualified for the Lottery.

76. Most of the Plaintiffs in this case are members of a protected class, namely African American. The Department treated them differently than applicants of other races in that it afforded them thorough notice of its findings and an opportunity to address them, whereas it afforded neither to Plaintiffs. This disparate treatment is unjustified, subject to strict scrutiny, and is the result of prohibited animus to favor the other applicants. All of the Plaintiffs in this case are also victims of "class of one" equal protection violations in that there is no rational basis for the disparate treatment.

### Count IV – Administrative Review

77. Plaintiffs reallege all allegations of this Complaint as if fully set out herein.

78. On or about September 3, 2020, The Department made final administrative decisions affecting Plaintiffs' rights. A copy of the decisions are attached hereto.

79. The court should review the decisions because they are not in accordance with the law, *inter alia*, for the reasons explained in this Complaint.

25

80. The Department should have reached the conclusion that Plaintiffs met all requirements for the highest score and should have been deemed a Tied Applicant as to each of the applications they submitted.

81. The Department is requested to file an answer to this Complaint consisting of the entire record of the process and grading resulting in the decision on Plaintiffs' application and on the applications of those deemed Tied Applicants.

82. Plaintiffs have exhausted all available remedies under the Administrative Review Law and have no further plain, speedy, adequate remedy under the law.

WHEREFORE, Plaintiffs respectfully request that Court grant the injunctive relief sought herein, as well as any other relief available in equity or at law, including but not limited to the Licenses under consideration. The injunctive relief sought includes but is not limited to a Court order:

A. Directing the Defendants to provide a deficiency notice of the same quality and thoroughness afforded the other applicants and/or treat the Department's September 3, 2020 notification of non-perfect scores to each of the Plaintiffs as the required deficiency notice, and accept and grade Plaintiffs' revised Exhibits. And upon completing that review, if Plaintiffs'

scores qualify for placement in the Lottery, Defendants should be further ordered to permit any Plaintiffs that do to participate.

Or, alternatively:

B. Temporarily enjoin the Lottery until the Court can adjudicate the fairness and accuracy of the Department's process and findings, including but not limited to whether the process for selecting the 21 Tied Applicants and excluding Plaintiffs was inherently flawed, marred by conflict of interest, erroneously executed, and/or violated the Plaintiffs' rights.


RESPECTFULLY SUBMITTED,

/s/Jon Loevy


Jon Loevy
Michael Kanovitz
Loevy and Loevy
311 North Aberdeen Street
Chicago, IL 60607
(312) 243-5900